MICHAEL MARTIN,                       )
                                      )
                Plaintiff,            )
                                      )
        v.                            )        1:16-cv-1191
                                      )
NORFOLK SOUTHERN RAILWAY              )
COMPANY; FLATIRON                     )
CONSTRUCTORS, INC.; DOGGETT           )
CONSTRUCTION COMPANY, INC.;           )
CHIPANLOG, LLC; CENTRAL               )
CAROLINA SEEDING, INC.; LOCKE         )
ROWE, INC.; SMITH-ROWE, INC.;         )
SMITH-ROWE, LLC; and FLATIRON-        )
BLYTHE DEVELOPMENT, a Joint           )
Venture,                              )
                                      )
                Defendants.           )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

On the night of February 14, 2015, Michael Martin was travelling on U.S. Route 29, a four-lane highway in Guilford County, North Carolina, on his way to repair broken railroad crossing gates at the behest of his employer, Norfolk Southern Railway Company ("NSRC"), when a tree from a construction area adjacent to the highway fell on his vehicle. Martin sued NSRC and a number of companies involved with the construction project to recover for the harm he suffered as a result of the accident. Before the court are motions for summary judgment by all Defendants pursuant to Federal Rule of Civil Procedure 56 (Docs. 102, 106, 108, 110, 112), a motion for voluntary dismissal by Martin pursuant

to Federal Rule of Civil Procedure 41(a)(2) (Doc. 117), and various motions addressing trial issues. The court held argument on the dispositive motions on December 7, 2018. For the reasons set forth below, Martin's motion to dismiss will be denied, Defendants' motions for summary judgment will be granted, and all remaining motions will be denied as moot.

## I. BACKGROUND

### A. Facts

The undisputed facts, taken in the light most favorable to Martin, as the non-moving party on the motions for summary judgment, show the following:

Martin, a North Carolina resident, worked for NSRC as a "signal maintainer." (Doc. 109-1 at 8–9.) That job included maintenance and repair of the public safety equipment NSRC employs at railroad crossings, such as the crossing gates that prevent vehicles from driving over the tracks when a train is passing through. (Doc. 107-1 at 2–3, 10–11.) Although Martin worked regular hours on weekdays, he was sometimes "on call" on weekends, meaning that he had to be available to work on signal equipment if requested by NSRC. (Doc. 109-1 at 9.) Martin was provided a pickup truck assigned to him by NSRC. (Id. at 10, 15.)

On February 14, 2015 — a Saturday — Martin received a call from NSRC to repair some railroad crossing equipment. (Doc. 107-1 at 6–9.) While working on repairs to crossing equipment in

Reidsville, North Carolina that evening, Martin received another call from NSRC, this one directing him to travel south to Greensboro, North Carolina to repair a broken crossing gate there. (Id. at 7–9.)  Martin testified that the weather at the time was "cold" with "periods of wind" or "gusts" that he described as "strong" and "blowing pretty hard."  (Doc. 109-1 at 14, 18, 22.) Although he could not recall whether there was any precipitation at the time, Martin stated that "to [his] knowledge," there were no weather conditions other than wind that would have caused him any danger.[1]  (Id. at 15, 19.)

    At some time "in the area of maybe 9:00 at night," as Martin was traveling down U.S. Route 29 toward Greensboro, a tree fell into the roadway, striking the top of his truck and injuring him. (Id. at 11, 16.)  The area adjacent to the road, from which the tree fell, was undergoing construction as part of a road-widening project by the North Carolina Department of Transportation ("NCDOT").  (Doc. 107-3.)  Photographs from the scene of the accident, taken 48 hours afterwards, appear to show that the base of the tree had originally been situated on the far bank of a small stream.  (Doc. 116-1.)  According to certified meteorological records from a nearby weather station in the Greensboro area, the

---

[1] Certified meteorological records from a weather station in the Greensboro area record no more than "trace" amounts of precipitation that evening.  (Doc. 107-2 at 3–4.)

wind speed observed at 7:00 p.m. on February 14, 2015, was 30 m.p.h., and the wind speed observed at 10:00 p.m. was 29 m.p.h.[2] (Doc. 107-2 at 6.)

## B. Procedural History

Martin filed his original complaint on September 30, 2016, bringing a Federal Employers' Liability Act (FELA) claim against NSRC and common law negligence claims against several companies allegedly involved in the nearby road-widening project: Flatiron Constructors, Inc. ("Flatiron, Inc."); Doggett Construction Company, Inc. ("Doggett"); and Chipanlog, LLC ("Chipanlog"). (Doc. 1.) On February 1, 2017, the court approved the parties' joint Rule 26(f) report, setting a discovery deadline of February 16, 2018. (Doc. 28.)

---

[2] In his briefing, Martin states that "[a]ll parties agree there was a storm with blowing winds of at least 49 miles per hour." (Doc. 119 at 6.) NSRC objects that it never agreed to any such thing. (Doc. 127 at 3 n.3.) Certified meteorological records from the Greensboro area show that the highest single wind speed measurement on February 14, 2015 — taken in 3-second intervals — was 49 m.p.h. (Doc. 109-2 at 3.) Martin's statement that winds were "at least" 49 m.p.h. is therefore misleading at best, since the wind speed did not exceed 49 m.p.h. at any time that day. More importantly, Martin offers no evidence or reason to believe that the three-second 49 m.p.h. measurement was taken during the time he was both working and near the Greensboro area, as opposed to any other three-second interval over the 24-hour period within which it could have occurred. The only meteorological evidence tied to the relevant time Martin was on the road is the record of observations at 7:00 p.m. and 10:00 p.m. of winds around 30 m.p.h. (Id. at 7.) Unfortunately, no party has provided evidence to aid the court's interpretation of these weather records. As a result, it is unclear how long observations were taken at those times, as well as whether the wind speed given is the highest observed or merely an average of some number of observations. Martin's counsel contended at the hearing on these motions that 30 m.p.h. would be the "highest" wind speed observed at the weather station at the relevant times.

One year after filing the original complaint, on September 6, 2017, Martin sought, and was granted, permission to file an amended complaint that added common law negligence claims against several other companies involved in the road-widening project: Central Carolina Seeding, Inc. ("Carolina Seeding"); Locke Rowe, Inc. ("Locke Rowe"); Smith-Rowe, Inc.; Smith-Rowe, LLC ("Smith-Rowe"); and Flatiron-Blythe Development, a Joint Venture ("Flatiron-Blythe"). (Doc. 35.) Pursuant to the parties' joint request, the Magistrate Judge extended the discovery deadlines in light of the newly-added parties as follows: initial expert reports and disclosures from Martin were due February 27, 2018; fact discovery ended on March 29, 2018; and all discovery closed on June 29, 2018. (Doc. 71.) On June 15, 2018, Martin again requested a discovery deadline extension to accommodate disclosure and deposition of fact and expert witnesses. (Doc. 89.) The Magistrate Judge denied that motion, noting in a thorough Order that Martin had failed to demonstrate that the untimeliness of his extension request was excusable or that he had been diligent in pursuing discovery. (Doc. 104.)

After the close of discovery, all Defendants filed motions for summary judgment. (Docs. 102, 106, 108, 110, 112.) Subsequently, Martin filed a Rule 41(a)(2) motion to voluntarily dismiss all Defendants other than NSRC (together, the "Construction Defendants"). (Doc. 117.) At the motion hearing on

December 7, 2018, the parties agreed to the dismissal of Chipanlog, Locke Rowe, and Smith-Rowe, Inc. as improper defendants. Recently, in preparation for trial, Defendants have filed a joint motion to bifurcate (Doc. 146), thirty motions in limine (Docs. 149, 151, 152, 154, 157, 159, 161, 163, 165, 167, 169, 171, 173, 175, 176, 179, 181, 183, 185, 187, 188, 191, 193, 194, 197, 199, 201, 203, 205, 207), and a joint motion for a protective order prohibiting Martin's *de bene esse* deposition of treating orthopedic surgeon Dr. Dahari Brooks (Doc. 259). Martin has filed a motion for leave to conduct the *de bene esse* deposition of Dr. Brooks. (Doc. 261.)

## II. ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Basnight v. Diamond Developers, Inc.</u>, 146 F. Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). In resolving a motion for summary judgment, the court views the "evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." <u>Id.</u> Summary judgment should be denied "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes

affirmatively that the adverse party cannot prevail under any circumstances." <u>Guessford v. Pa. Nat'l Mut. Cas. Ins. Co.</u>, 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting <u>Campbell v. Hewitt, Coleman & Assocs., Inc.</u>, 21 F.3d 52, 55 (4th Cir. 1994)).

### A. NSRC's Motion for Summary Judgment

#### 1. Evidentiary Issues

In his response brief, Martin relies heavily on a declaration by Bryan Shoffner, another NSRC employee tasked with repairing crossing gates on the night of February 14, 2015. (Doc. 119-1.) Shoffner states that he was working in an undisclosed "territory to the east" of Martin, that it was "raining" and "stormy" that night as well as "windy," and that NSRC told him to "load extra [crossing] gate arms" into his work vehicle in anticipation of existing crossing gates being compromised by the wind. (<u>Id.</u> at 2.) Shoffner also states that NSRC "routinely monitors the weather" and that — after learning that Martin was injured — his supervisor instructed him to return home "due to the extreme weather." (<u>Id.</u> at 2–3.) NSRC objects to Shoffner's declaration on the ground that Shoffner was never disclosed or mentioned in discovery, in violation of Federal Rule of Civil Procedure 37(c)(1). (Doc. 127.) As a result, NSRC argues, the court should not consider the Shoffner declaration in resolving its motion for

summary judgment.[3]

Rule 37(c)(1) states:

> If a party fails to provide information or identify a
> witness as required by Rule 26(a) or (e), the party is
> not allowed to use that information or witness to supply
> evidence on a motion, at a hearing, or at a trial, unless
> the failure was substantially justified or is harmless.

Fed. R. Civ. P. 31(c)(1).  In Southern States Rack & Fixture, Inc.

v. Sherwin-Williams Co., 318 F.3d 592 (4th Cir. 2003), the Fourth

Circuit approved the following five factors for use in determining

whether a failure to disclose is "substantially justified" or

"harmless":

> (1) the surprise to the party against whom the evidence
> would be offered; (2) the ability of that party to cure
> the surprise; (3) the extent to which allowing the
> evidence would disrupt the trial; (4) the importance of
> the evidence; and (5) the nondisclosing party's
> explanation for its failure to disclose the evidence.

Id. at 597.  Martin's counsel conceded at the motion hearing that

he did not identify Shoffner under Rules 26(a) or (e) prior to

filing the declaration.  The question is whether his failure to do

so is substantially justified or harmless under the Southern States

factors.

NSRC claims surprise, which is apparent.  Martin failed to

identify Shoffner as part of his Rule 26(a) disclosures on February

---

[3] Local Rule 7.6 permits a moving party to raise an evidentiary objection
in its reply brief, as NSRC did here, rather than file a separate motion
to strike.  The same rule allows non-moving parties to file a surreply
addressing the evidentiary objection within seven days.  Martin did not
file a surreply.

28, 2017, or in his amended disclosures on April 10, 2018. (Docs. 127-1, 127-2.) Martin never mentioned Shoffner when NSRC deposed him or in any other way prior to filing Shoffner's declaration. Now that discovery has long since closed, NSRC cannot depose Shoffner or gather any other evidence pertaining to his declaration in order to cure its surprise at his late-blooming appearance. The importance of the Shoffner declaration to Martin is at best moderate, given that his testimony about the weather on the night in question is based on his observations in an unknown "territory to the east," contains vague and general statements about the conditions in that other territory ("very stormy, raining, windy" and "the wind was rocking us hard" (Doc. 119-1 at 2)), and appears to conflict with certified meteorological records (Doc. 109-2) from the Greensboro area upon which Martin also seeks to rely. See also footnote 5, infra. The explanation provided by Martin's counsel at the motion hearing for his failure to disclose Shoffner — that he simply was not aware of Shoffner until he "went and started tracking down . . . people so we would have a response" to NSRC's summary judgment motion — is inadequate. As noted in the Magistrate Judge's prior order denying Martin's motion for extension of time to complete discovery: "By any calculation, this case has been allowed a discovery period beyond what would ordinarily b[e] allowed or contemplated by the Local Rules." (Doc. 104 at 5–6.) It was clear from the outset that Martin contended

that the weather conditions were an important factor in this case. The time for "tracking down" fact witnesses had long since passed by the time NSRC filed its motion for summary judgment, and Martin's counsel offered no reason at the hearing why he could not have located Shoffner earlier.

Considering all the Southern States factors, as well as the record as a whole, the court finds they weigh strongly against a finding that Martin's nondisclosure was "substantially justified" or "harmless."[4] As a result, the Shoffner declaration will not be considered for purposes of resolving NSRC's motion for summary judgment.[5]

### 2. Merits of Summary Judgment Motion

NSRC argues that "[a]n essential part of Plaintiff's [FELA]

---

[4] The third Southern States factor — whether "allowing the evidence would disrupt the trial," Southern States, 318 F.3d at 597 — does not weigh against Martin. However, courts need not find that every Southern States factor weighs against the nondisclosing party if exclusion is otherwise warranted. See, e.g., Hoyle v. Freightliner, LLC, 650 F.3d 321, 330 & n.6 (4th Cir. 2011).

[5] Even if the court were to consider it, the evidence in the Shoffner declaration would not save Martin from summary judgment. As noted, Shoffner's weather-related observations fail to provide sufficient evidence to create a genuine issue of material fact as to the severity of the weather in Martin's territory. His statement that NSRC instructed him to return home after it learned Martin was injured (Doc. 119-1 at 2) is not relevant to whether NSRC had been negligent in sending Martin out in the first place, and any attempt to use this fact for that purpose would likely be precluded as a subsequent remedial measure under Federal Rule of Evidence 407. Finally, his statements that NSRC "routinely monitors the weather" and "was aware of the impending storm as [Shoffner's] supervisor had instructed [him] to load extra gate arms onto [his] truck" (id. at 2–3) fail to create a material issue of breach of a duty on NSRC's part for merely requesting that an employee travel a four-lane public highway on a windy night.

claim is the element of foreseeability," and that the meager evidence marshaled by Martin is insufficient to show that a reasonable employer in NSRC's place would have known that periodic windy conditions made it unsafe to drive on a public highway. (Doc. 109 at 4–7, 10–13.)  Martin, in the one page or less of legal argument he devotes to the merits of NSRC's summary judgment motion, makes the conclusory statement that NSRC's "choice to put employees on the road, and more particularly the reasonableness of that choice," is a question to be resolved by the jury. (Doc. 119 at 7–8.)

The text of FELA, in pertinent part, reads as follows:

> Every common carrier by railroad while engaging in commerce between any of the several States or Territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . .

45 U.S.C. § 51.[6]  The language "injury or death resulting in whole or in part from the [railroad's] negligence" in § 51 amounts to a

---

[6] FELA also makes railroads liable for injuries resulting from "any defect or insufficiency, due to [the railroad's] negligence, in [the railroad's] cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."  45 U.S.C. § 51.  While Martin initially appeared to base his FELA claim against NSRC at least partially on alleged defects in the vehicle NSRC provided him, see (Doc. 35 ¶ 47 ("NSRC . . . provid[ed] Plaintiff with a truck with defective airbags")), he has since abandoned that theory, see (Doc. 119 at 5 ("Plaintiff is making no allegations regarding the operation or failure of operation of the vehicles [sic] airbags.")).

relaxation of the common-law negligence element of causation.[7] See Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 543 (1994); Rogers v. Missouri Pac. R.R. Co., 352 U.S. 500, 506 (1957) ("Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.").[8]

However low the causation standard, "the plaintiff still carries the burden of proving some act of negligence by the [railroad]," Deans v. CSX Transp., Inc., 152 F.3d 326, 330 (4th Cir. 1998). The standard for what constitutes an act of negligence under FELA is the same as that under the common law: "the employer's liability is to be determined under the general rule which defines negligence as the lack of due care under the circumstances." Tiller v. Atl. Coast Line R.R. Co., 318 U.S. 54, 67 (1943); see also Gottshall, 512 U.S. at 544 ("[U]nless they are expressly rejected in the text of the statute, [common-law principles] are entitled to great weight."). Therefore, "[r]easonable foreseeability of harm is an essential ingredient of FELA negligence." Brown v. CSX Transp., Inc., 18 F.3d 245, 249

---

[7] FELA also expressly repudiates certain common-law negligence defenses such as assumption of the risk and the fellow-servant rule. 45 U.S.C. §§ 53–55.

[8] Further, railroad companies cannot delegate their duty to provide employees with a safe place to work. Brown v. CSX Transp., Inc., 18 F.3d 245, 249 (4th Cir. 1994).

(4th Cir. 1994); see also id. ("[R]ailroad employers are not the insurers of their employees." (citing Inman v. Baltimore & Ohio R.R. Co., 361 U.S. 138, 140 (1959))).

In general, "the existence of transient conditions created by the weather do not, standing alone, create liability under FELA." Borum v. Grand Trunk W. R.R., Inc., 659 F. Supp. 2d 853, 857 (E.D. Mich. 2009). As the North Carolina Supreme Court has observed in assessing a FELA claim, "[a] railroad must operate its trains through fair weather and foul, and cannot stop all switching operations until all . . . storms are over, if it is efficiently to operate its business." Bennett v. S. Ry. Co., 96 S.E.2d 31, 38 (N.C. 1957). The issue in this case is not whether "transient" weather conditions have a controlling categorical status — counsel for NSRC admitted at the motion hearing that there could certainly be some weather conditions severe enough to create foreseeable dangers to NSRC employees. Instead, the issue is simply whether the record contains evidence on which a jury could find that NSRC was negligent.

The unfortunate fact here for Martin is that, in the paucity of evidence he has offered, he has failed to create a genuine issue of material fact that his injury was foreseeable to NSRC. Although he offers speculation that NSRC received daily weather forecasts and therefore had "some type of idea what's going to happen" with the weather, Martin is unable to say what the weather forecast was

for the day in question or whether the forecast accurately portrayed the conditions that evening. (Doc. 109-1 at 20.) The record is barren of any evidence of what NSRC knew or would have known about the weather prior to Martin's injury. Although Martin testified that he had on multiple prior occasions notified his supervisor when he felt that the weather conditions might make working unsafe, he did not report anything of the kind on the evening he was injured. (Id. at 25.)

Even assuming that NSRC had perfect knowledge of the weather conditions at the time Martin was injured, which — according to undisputed weather records from the Greensboro area — included winds of up to 30 m.p.h. (Doc. 109-2 at 7),[9] there is no evidence in the record that such weather normally creates any danger of trees falling onto large public interstate highways and striking passing vehicles, much less evidence that NSRC knew or should have known of such a danger. There is no evidence in the record that 30 m.p.h. winds are unusual or cause heightened danger to motorists; in fact, the certified weather records show that winds in Greensboro reached or exceeded 30 m.p.h. on eight different days in February 2015 alone. (Doc. 109-2 at 3.) Absent evidence to the contrary, which is not in this record, NSRC is entitled to rely on the reasonable assumption that large, interstate highways

---

[9] Martin offers no certified weather records. The only records are offered by NSRC and co-Defendants.

like U.S. Route 29 are properly maintained by the appropriate authorities, such that motorists are not endangered by roadside trees being knocked down on them by 30 m.p.h. winds. Martin himself does not claim that he believed at the time that the wind made it unsafe to drive, and he testified that the wind was only "period[ic]" and "might have not been blowing" as hard in some areas or at some times. (Doc. 109-1 at 14, 25.) He also reports that he did not see a single downed tree on the night in question, other than the one that struck his vehicle. (Id. at 18.)

As evidence of NSRC's knowledge of the alleged severity of the wind, Martin relies on his statement that there were "double the usual rate of [crossing gate] failures" during a 33-hour period from February 14–15, 2015, which he attributes to the "storm." (Doc. 119-2 at 2.) However, even were the court to assume that the gate failure rate was this high prior to the accident on the evening of February 14, 2015, that NSRC would have known about the elevated gate failure rate before sending Martin out to work, and that the cause of the elevated gate failure rate was wind, Martin offers no link between winds sufficient to cause higher-than-normal levels of crossing gate failure and winds sufficient to blow large trees onto the highway.[10]

---

[10] In his affidavit, Martin states that — in lieu of sending him to repair the crossing gates — NSRC could have used "flagmen" at crossings to allow trains to proceed through crossings despite damaged crossing gates. (Doc. 119-2 at 2.) He therefore argues that NSRC had a "reasonably safe

In sum, Martin has not forecast evidence on which a jury could determine that his accident was foreseeable to NSRC.[11] As a result, NSRC's motion for summary judgment will be granted.

## B.  Martin's Rule 41(a)(2) Motion to Dismiss

Martin moves to dismiss without prejudice his claims against the Construction Defendants — who had allegedly conducted some operations in the area of the tree that fell — pursuant to Federal Rule of Civil Procedure 41(a)(2).  (Doc. 117.)  All Construction

---

alternative available" for operating its trains that did not involve sending Martin out to fix crossing gates.  (Doc. 119 at 7.)  To the extent this discussion is offered to support an argument that NSRC was negligent under FELA for sending Martin out to fix crossing gates when it could have used flagmen instead, it is unavailing.  As an initial matter, it is pure speculation that flagmen standing at crossings would be any safer from alleged wind dangers than signal maintainers travelling on public highways.  Moreover, even if flagmen would be safer, the Fourth Circuit has been clear that the question in FELA cases is "whether the Railroad . . . exercised reasonable care for the safety of [the plaintiff], not whether the Railroad could have employed a safer method for" getting the job done.  Stillman v. Norfolk & W. Ry. Co., 811 F.2d 834, 838 (4th Cir. 1987) (affirming district court's "exclu[sion] as irrelevant" the plaintiff's testimony pertaining to a "safer, alternative way" of working on railroad cars that would have presumably prevented the plaintiff's injury).

[11] The court further notes — as discussed in more detail herein — that Martin does not proffer any admissible evidence of why the tree fell, let alone evidence that wind caused the tree to fall.  And if the wind was not a cause of the tree falling, Martin is left with mere "but for" causation: had NSRC not called him in to work, his truck would not have been struck by a falling tree on the highway.  Low as the causation standard may be for FELA cases, it requires the existence of some non-speculative evidence — beyond pure "but for" evidence — that the plaintiff's injury was caused in some part by the alleged dangerous condition.  See CSX Transp., Inc. v. McBride, 564 U.S. 685, 703-04 (2011) (explaining that the dissent's fears of "juries . . . award[ing] damages in far out 'but for' [causation] scenarios" were unrealistic, since "judges would have no warrant to submit such cases to the jury" under even the relaxed FELA causation standard).

Defendants oppose the motion at this stage of the proceedings.

Dismissal under Rule 41(a)(2) should not be denied unless the non-moving party is "unfairly prejudiced." Davis v. USX Corp., 819 F.2d 1270, 1273 (4th Cir. 1987); see Dean v. WLR Foods, Inc., 204 F.R.D. 75, 77 (W.D. Va. 2001) ("In considering prejudice, the primary focus of the court should be the interests of the defendant."), aff'd sub nom. Dean v. Gilmer Indus., Inc., 22 F. App'x 285 (4th Cir. 2001). In making this determination, district courts typically consider the following four factors:

> (1) the opposing party's effort and expense in preparing for trial; (2) excessive delay or lack of diligence on the part of the movant; (3) insufficient explanation of the need for a dismissal; and (4) the present stage of the litigation, i.e., whether a dispositive motion is pending.

Hobbs v. Kroger Co., No. 98-1831, 1999 WL 156045, at *1 (4th Cir. Mar. 23, 1999) (unpublished table decision) (citing Phillips USA, Inc. v. All-flex USA, Inc., 77 F.3d 354, 358 (10th Cir. 1996); Paulucci v. City of Duluth, 826 F.2d 780, 783 (8th Cir. 1987)); accord Miller v. Terramite Corp., 114 F. App'x 536, 539 (4th Cir. 2004) (unpublished).[12] Each will be considered, as well as any other factor that is relevant.

---

[12] The Fourth Circuit has recognized that its "jurisprudence on the issue of what constitutes sufficient prejudice to a nonmovant to support denial of a motion for voluntary dismissal under Rule 41(a)(2) is not free from ambiguity." Howard v. Inova Health Care Servs., 302 F. App'x 166, 179 (4th Cir. 2008) (unpublished). While not precedential, unpublished decisions of the Fourth Circuit are valuable for their persuasive reasoning and are cited herein for that limited purpose. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

At the motion hearing, counsel for the Construction Defendants roughly estimated their costs at around $2,000 apiece for deposition transcripts and for the mediator. Counsel for Carolina Seeding estimated its costs at a "couple thousand" higher, given that the company had retained an expert arborist. All Defendants have of course been through the entirety of the discovery process and have produced and received thousands of pages of documents. These efforts and expenses are a factor, but they are not high for a typical civil case. See (Doc. 104 at 5 n.3). This factor is essentially neutral.[13]

As to the second factor — whether there has been "excessive delay or lack of diligence on the part of the movant" — Martin's bald assertion that there has been no lack of diligence is not supported by the record and fails to acknowledge the court's previous findings. As the Magistrate Judge noted in her order denying Martin's motion for extension of time to complete discovery (Doc. 104), Martin filed his complaint on September 30, 2016. Martin's first discovery deadline gave him over a year to conduct discovery, and the court later extended that deadline when Martin added new defendants (Carolina Seeding; Locke Rowe; Smith-Rowe, Inc.; Smith-Rowe; and Flatiron-Blythe) to the original group of

---

[13] Martin's Rule 41(a)(2) motion became ripe for decision on September 26, 2018. Of course, each Defendant has since engaged in significant case preparation, including readiness for trial, which the court has not considered.

Construction Defendants (Flatiron, Inc.; Doggett; and Chipanlog). In all, Martin had approximately 14 months to conduct fact discovery, which the court noted was "[b]y any calculation . . . a discovery period beyond what would ordinarily b[e] allowed or contemplated by the Local Rules." (Id. at 5–6.) Martin was given nearly 13 months to conduct his initial expert discovery, plus an additional month after Defendants' expert deadline in which to conduct rebuttal expert discovery. (Id. at 2; Doc. 71.) Despite allegedly insisting on establishing separate deadlines for expert discovery (Doc. 104 at 3 n.2), Martin did not retain a single expert.[14] His fact discovery appears to be limited to sending some written discovery and taking photographs of the accident site. (Doc. 104 at 4–5; Doc. 101 at 3.)

After the 14-month fact discovery period had passed, Martin "untimely served Defendants with Notice of Rule 30(b)(6) depositions." (Doc. 104 at 2.) Defendants moved for protective orders, and Martin withdrew his deposition notices and noted his intent to move for a second discovery extension. (Id.; Doc. 87.) A motion for extension of the fact discovery period would have already been untimely when Martin expressed his intent to file it, but Martin delayed several weeks further, eventually filing it two

_____

[14] Martin does appear to intend to rely on the testimony of his treating physician for damages.

and one-half months after the fact discovery period had ended.[15] (Doc. 104 at 2.)  The court denied his motion not only because he failed to show excusable neglect as to his untimely-filed motion, but also because he "failed to demonstrate that he ha[d] diligently pursued discovery" during the generous period allotted him.  (Id. at 4.)  On Martin's own admission, the total evidence he compiled during the entire extended discovery period was "nothing more than jumbled contract documents and photographs."  (Doc. 101 at 3.)

On this record of untimely filings and minimal discovery effort, Martin now asserts nevertheless that he has "attempted to progressively move this case forward."  (Doc. 118 at 4.)  The primary effort in this regard appears to have been his amendment of the complaint to add certain of the Construction Defendants to those named in the original complaint.  But this happened nearly a year before his motion for a voluntary dismissal, and it is his claims against all the Construction Defendants that Martin now contends is the reason for dismissal, citing alleged difficulties the jury might have in distinguishing the standards for his FELA and common-law negligence claims.  Martin gives no reason why it took him two years to conclude that his FELA and common-law negligence claims would work jury confusion if tried together, and the court cannot think of a convincing one.  Martin's lack of

---

[15] Martin requested further fact discovery and further expert discovery. (Doc. 89.)  The latter request was timely; the former request was not.

diligence weighs heavily against his Rule 41(a)(2) motion.  Cf.
Paturzo v. Home Life Ins. Co., 503 F.2d 333, 336 (4th Cir. 1974)
(affirming denial of a voluntary dismissal where the plaintiff
would, in a successive case, "obtain those rights he had forfeited
[in the initial case] through his own lack of diligence").[16]

The third factor -- Martin's "explanation of the need for a
dismissal" -- is equally unpersuasive.  As noted, Martin litigated
both his FELA and common-law negligence claims from the outset for
nearly two years before filing the instant motion, even adding
more negligence claims a year in.  The court is skeptical that
Martin identified his juror-confusion argument only after all
Defendants filed their motions for summary judgment.  Either way,
any perceived need for dismissal on this basis falls away now that
the only FELA claim in the case is being dismissed.  This leaves
only Martin's common-law negligence claims and obviates any
possibility of juror confusion as to the applicable legal
standards.  The insufficiency of Martin's explanation of his need
for dismissal weighs heavily against his Rule 41(a)(2) motion.

The fourth and final factor concerns the stage of the

---

[16] As this district has previously noted, "occasional lack of diligence"
in a case — at least when paired with a "relative[ly] timel[y]" Rule
41(a)(2) motion — is not a strong reason to deny the motion.  Haynes v.
Genuine Parts Co., No. 13CV615, 2015 WL 8484448, at *5-6 (M.D.N.C. Dec.
9, 2015) (emphasis added); see also Davis, 819 F.2d at 1275 (noting that
the mere "possibility that the plaintiff will gain a tactical advantage
over the defendant in future litigation will not serve to bar a second
suit").  In the instant case, little about Martin's prosecution of the
case — including his Rule 41(a)(2) motion — has been timely.

litigation — specifically, "whether a dispositive motion is pending." <u>Hobbs</u>, 1999 WL 156045, at *1. Little analysis is needed here, as Martin filed his voluntary dismissal motion after five motions for summary judgment were already pending. In his initial brief, Martin waives off these dispositive motions as "simply technical based requests for relief." (Doc. 118 at 5.) A grant of summary judgment is a ruling on the merits. Further, all Defendants rest their motions on insufficient record evidence against them — not some sort of legal or procedural technicality. In his reply brief, Martin alters his approach, relying on an Eleventh Circuit case for the proposition that there is "no per se rule that the pendency of a summary judgment motion precludes a district court from granting a Rule 41(a)(2) voluntary dismissal." (Doc. 130 at 3 (citing <u>Pontenberg v. Boston Sci. Corp.</u>, 252 F.3d 1253 (11th Cir. 2001)).) This is certainly true,[17] but Martin's argument is irrelevant to the court's analysis here. The court is not hewing to any per se rule, but is instead weighing a number of factors of which the pendency of summary judgment motions is only one. Although the existence of Defendants' previously-filed

---

[17] Indeed, Martin had no need to look to the Eleventh Circuit for the proposition he urges, as the Fourth Circuit has also held that "the mere filing of . . . a motion for summary judgment could not, without more, be a basis for refusing to dismiss without prejudice." <u>Andes v. Versant Corp.</u>, 788 F.2d 1033, 1036 n.4 (4th Cir. 1986); <u>but see</u> <u>Howard</u>, 302 F. App'x at 179–80 (highlighting "ambiguity" in the way the Fourth Circuit has weighed the pendency of summary judgment motions in the Rule 41(a)(2) analysis).

summary judgment motions would not itself be sufficient to deny Martin's Rule 41(a)(2) motion, it does weigh against Martin's motion.

Considering all these factors as well as the record as a whole, the court finds that Martin's lack of diligence, his insufficient explanation of the need for a dismissal, the pendency of dispositive motions, as well as the stage of the proceedings — taken collectively — counsel against granting his Rule 41(a)(2) motion.[18] See Howard v. Inova Health Servs., 302 F. App'x 166, 180

---

[18] At the motion hearing, Martin rested his Rule 41(a)(2) argument on Bradley v. Baxter Healthcare Corp., No. 1:10cv230, 2011 WL 4595798 (W.D.N.C. Sept. 6, 2011), adopted by 2011 WL 4595216 (W.D.N.C. Sept. 30, 2011). In Bradley, the magistrate judge recommended that the plaintiff's Rule 41(a)(2) motion be granted despite pending summary judgment motions and the plaintiff's untimely filing because the defendants had incurred few costs and because the plaintiff had "set forth a valid reason for seeking a voluntary dismissal." Id. at *2. That "valid reason," wrote the magistrate judge, was that the plaintiff "face[d] the entry of summary judgment in favor of Defendants because of his failure to obtain an expert." Id. Bradley's reasoning is unpersuasive in the context of the present case. Bradley's conclusion that avoiding an imminent defeat at summary judgment was a "valid reason" for voluntary dismissal conflicts with a number of cases in which this and other district courts in the Fourth Circuit — and even the Fourth Circuit itself, in unpublished cases — have found that "a motion to voluntarily dismiss under Rule 41(a)(2) should be denied when a plaintiff seeks to circumvent an expected adverse result" in a dispositive motion. Nesari v. Taylor, 806 F. Supp. 2d 848, 861 (E.D. Va. 2011); see, e.g., Skinner v. First Am. Bank of Va., No. 93-2493, 1995 WL 507264, at *2 (4th Cir. Aug. 28, 1995) (unpublished table decision) ("[D]enial of voluntary dismissal is appropriate where summary judgment is imminent." (quoting Davis, 819 F.2d at 1274)); St. Clair v. Gen. Motors Corp., 10 F. Supp. 2d 523, 531 (M.D.N.C. 1998) (denying Rule 41(a)(2) motion because, inter alia, it was filed "in direct response" to defendant's motion for summary judgment and plaintiff was "attempt[ing] to avoid the adverse consequences of his own failure to comply with the deadlines originally set out in the Joint Rule 26(f) Report"). Moreover, more recent cases from the same district that issued Bradley appear to have abandoned its reasoning. See Walker v. Queens Gap Mountain, LLC, No. 1:10-cv-00290-MR-DCK, 2013 WL 5492519,

(4th Cir. 2008) (unpublished) ("Given the stage of the litigation,
[the plaintiff's] insufficient explanation for a voluntary
dismissal, and his lack of diligence . . . the district court did
not abuse its discretion in finding a 'sufficient basis' to deny
[the plaintiff's] motion to dismiss without prejudice." (quoting
Andes v. Versant Corp., 788 F.2d 1033, 1036-37 (4th Cir. 1986)));
see also Francis v. Ingles, 1 F. App'x 152, 154 (4th Cir. 2001)
("Considering plaintiff's lack of diligence, noncompelling reason
for the dismissal, and inconvenience dismissal would have imposed
on the defendant in this case, we find that the district court did
not abuse its discretion by denying plaintiff's [Rule 41(a)(2)]
motion."). To avert prejudice to Defendants, the motion will be
denied.

## C. Construction Defendants' Motions for Summary Judgment

The remaining Construction Defendants, and their roles vis-
à-vis the road-widening project, are as follows: Flatiron-Blythe

---

at *5 (W.D.N.C. Oct. 1, 2013) (writing that a suspected attempt to
"seek[] a dismissal to circumvent an expected adverse result" was "an
improper purpose" for voluntary dismissal under Rule 41(a)(2)); Black
v. Parsons, No. 3:12-cv-286-RJC, 2013 WL 566856, at *3 (W.D.N.C. Feb.
13, 2013). Finally, even if the court were to find Bradley persuasive,
it would not aid Martin. Martin has been very specific about his
rationale for dismissing the case, and — according to him — it has
nothing to do with the pending summary judgment motions. Instead, he
cites only to potential jury confusion, and at the hearing disavowed any
need for expert testimony. (Doc. 118 at 5 (stating that he seeks
voluntary dismissal "[t]o avoid confusion and the opportunity for
inconsistent verdicts").) Given the court's finding above that — on the
current facts — this is not a sufficient reason for voluntary dismissal,
Bradley and cases like it are distinguishable.

was the general contractor, pursuant to a contract with NCDOT, for the road-widening project. (Doc. 102-1 at 1-2.) The other Construction Defendants were subcontractors. Carolina Seeding subcontracted with Flatiron-Blythe to provide "erosion control services." (Id. at 2.) Doggett subcontracted with Flatiron-Blythe to "perform . . . the removal of trees and stumps." (Doc. 107-3 at 1.) Smith-Rowe subcontracted with Doggett to "cut some trees in the area of the accident." (Doc. 110-2 at 2.)

Martin does not mention Flatiron, Inc.'s role in the project, and Flatiron, Inc. states (in combined briefing with Flatiron-Blythe, collectively the "Flatiron Defendants") that it "had no role or involvement in the Project" at all. (Doc. 113 at 8-9.) Martin neither acknowledges Flatiron, Inc.'s argument nor differentiates between the two Flatiron Defendants in his briefing. (Doc. 122.) The only evidence in the record pertaining in any way to either of the Flatiron Defendants is what the Defendants themselves provide in their motions, and nothing in that evidence points toward any involvement by Flatiron, Inc. in the road-widening project. As a result, there is no genuine issue of material fact with respect to Flatiron, Inc., and its motion for summary judgment will be granted on that basis.

This leaves Martin's negligence claims against Flatiron-Blythe, Carolina Seeding, Doggett, and Smith-Rowe. These Defendants generally make the same overarching argument: that

Martin has failed to adduce any evidence that could establish that any Construction Defendant had a duty of care to him, that any Construction Defendant violated any duty of care that might have existed, and/or that any such violation caused Martin's injuries. (Docs. 103, 107, 111, 113.)

In his response briefing, as to Flatiron-Blythe, Doggett, and Smith-Rowe, Martin appears not to argue ordinary negligence. (Docs. 120, 121, 122.)[19]   Instead, he argues that felling trees near a highway is an inherently dangerous activity.  (Doc. 122 at 4-5.)   Next, he argues that the Construction Defendants should have known their activities were dangerous (id. at 5-6.), and that it was foreseeable that the tree's position on the bank of a stream would cause it to fall onto the roadway.   As a result, he argues, Flatiron-Blythe, Doggett, and Smith-Rowe's "fail[ure] to either redirect the water from the root system of the offending tree or cut down that tree so that it would not be undermined"[20] constitutes a failure to take necessary and reasonable precautions.  (Id. at 6-7.)   As to causation, Martin argues that his post-accident

_____

[19] Martin's arguments in response to the summary judgment motions by Flatiron-Blythe, Doggett, and Smith-Lowe are largely identical.   For readability purposes, citations will be made to only one brief rather than all three.

[20] At times, Martin has hinted that the very existence of the stream is the fault of the Construction Defendants; at the motion hearing, Martin's counsel represented that he believed the stream was "caused by the construction."   There is no evidence in the record to support such pure speculation, and therefore any claim based on that allegation would fail.

viewing of the scene as well as post-accident photographs amount to competent evidence that the tree's roots were undermined and that this caused the tree to fall. Finally, as an alternative theory, Martin argues that Flatiron-Blythe, Doggett, and Smith-Rowe are liable under a specific line of North Carolina doctrine recognizing liability for injuries caused by a "natural condition" of land "near a public highway" when the "possessor of land" does not exercise reasonable care to prevent the harm. (Id. at 8–9.) As to Carolina Seeding, Martin's one-page response brief appears to argue only that Carolina Seeding's expert report is inadmissible and that there exists a genuine issue of material fact with respect to causation. See (Doc. 115 at 2 ("[T]here remains a genuine issue of material fact as to whether the soil erosion efforts employed by [Carolina Seeding] contributed to the falling of the tree in question.")).

In North Carolina, inherently dangerous activity claims are a means of defeating the "general rule . . . that one who employs an independent contractor is not liable for the independent contractor's acts." Reynoso v. Mallard Oil Co., 732 S.E.2d 609, 611 (N.C. Ct. App. 2012). In other words, whether or not an activity is inherently dangerous has no bearing on the independent contractor's duties; rather, it bears on whether the independent contractor's employer is permitted to delegate its duty of care to the independent contractor. See Kinsey v. Spann, 533 S.E.2d 487,

491 (N.C. Ct. App. 2000) (noting that "the employer has a non-delegable duty for the safety of others" as to an inherently dangerous activity claim). An inherently dangerous activity claim, then, can only be made out against employers of independent contractors, and only negligence by the employer is relevant to such a claim. See id. (writing that, "[w]ith respect to negligence claims based upon inherently dangerous activities," North Carolina "courts have clarified that it is the negligence of the employer, not the independent contractor, that must be considered").[21]

An inherently dangerous activity claim has four elements:

> First, the activity must be inherently dangerous. Second, at the time of the injury, the employer either knew, or should have known, that the activity was inherently dangerous. Third, the employer failed to take the necessary precautions to control the attendant risks. And fourth, this failure by the employer proximately caused injury to plaintiff.

Id. at 492 (citations omitted). The third element of an inherently dangerous activity claim — whether the defendant "failed to take the necessary precautions to control the attendant risks" — is merely the traditional "reasonable care" standard drawn from ordinary negligence principles. Woodson v. Rowland, 407 S.E.2d 222, 234 (N.C. 1991) (stating that, as to inherently

---

[21] Although there was historically some confusion in North Carolina courts about this issue, it has become clear in more recent years that inherently dangerous activity claims are direct claims against the employer, rather than vicarious claims based on some underlying negligence by the independent contractor. See Kinsey, 533 S.E.2d at 491.

dangerous activities, "taking the necessary safety precautions can demonstrate reasonable care protecting the responsible party from liability under a negligence standard" and that "[l]iability for injuries caused by such activities is not strict, but is based on negligence").[22]

Separately from all this, North Carolina law provides that "a landowner has a duty to exercise reasonable care regarding natural conditions on his land which lies adjacent to a public highway in order to prevent harm to travelers using the highway." Gibson v. Hunsberger, 428 S.E.2d 489, 492 (N.C. Ct. App. 1993). Although some North Carolina courts refer to liability for the "landowner" in discussing this doctrine, other courts have used "the term 'landowner' . . . [to] refer[] to both owners and occupiers of land" in treating premises liability claims. Nelson v. Freeland, 507 S.E.2d 882, 883 n.1 (N.C. 1998) (emphasis added) — and the doctrine itself is an "adopt[ion]" of the rules laid out in parts of the Second Restatement of the Law of Torts, which uses the phrase "possessor of land." Gibson, 428 S.E.2d at 491 (emphasis added). Finally, the landowner, occupier, or possessor "is subject to liability only if he had actual or constructive notice of a dangerous natural condition." Id. at 492.

---

[22] Under North Carolina law, "inherently dangerous" activities — which impose only a duty of reasonable care — are distinguishable from "ultrahazardous" activities, for which there is strict liability. Woodson, 407 S.E.2d at 234-35.

As an initial matter, Martin's inherently dangerous activity arguments as to Smith-Rowe are clearly inapposite, since the facts do not show (nor does Martin allege) that Smith-Rowe employed an independent contractor. This of course does not mean that Smith-Rowe cannot be sued for its allegedly negligent acts, but only that such a suit would sound in ordinary negligence. See Evans v. Elliott, 17 S.E.2d 125, 129 (N.C. 1941) ("The contractor may, of course, be liable for the same want of due care in not taking the necessary precautions, for the omission of which the employer becomes liable; but as to the employer . . . public policy fixes him with a non-delegable duty to see that the precautions are taken.").

Concerning Flatiron-Blythe and Doggett, who are at least entities against which an inherently dangerous activity claim might be brought, the court is unpersuaded that the activity at issue here is actually inherently dangerous. Martin's argument turns on the observation made in Kinsey v. Spann, 533 S.E.2d 487 (N.C. Ct. App. 2000) that "although tree felling in a rural, forested area is not inherently dangerous, a jury could conclude that performing such work in a populated urban area . . . is inherently dangerous." Id. at 492 (citation omitted); accord Evans, 17 S.E.2d at 129-30 (remarking, in dicta, that "the cutting and removal of a large tree in close proximity to dwellings and in an area traversed by many people would probably be sufficiently

hazardous as to require precautions"). But Martin was not injured as a result of the felling of a tree by any Defendant. Instead, as Martin himself puts it, "[i]t was defendants' <u>failure</u> to remove the tree" that comprises the negligent action (or nonaction) in this case.[23] (Doc. 122 at 7.) Martin cites no North Carolina case supporting the theory that mere decisions about whether a tree should or should not be felled constitute an inherently dangerous activity, and the court is unconvinced that North Carolina courts would so hold were the issue to come before them. The risk of harm that makes tree felling in populated areas an inherently dangerous activity is the possibility that the tree being cut down might land on someone — this is the factual scenario underlying <u>Kinsey</u>. Thus, as <u>Kinsey</u> makes clear, "tree felling" in this context refers to "[c]utting and removing a tree." <u>Kinsey</u>, 533 S.E.2d at 492 (quoting <u>Evans</u>, 17 S.E.2d at 129). On this logic, "tree felling" — for purposes of the inherently dangerous activity analysis — does not encompass the decision to leave a tree untouched. As a result, Martin's inherently dangerous activity arguments fail as to all Construction Defendants against whom they are raised.

---

[23] As noted elsewhere, Martin also argues that one or more of the Construction Defendants could have "controll[ed]" the nearby stream "in a way to preserve the stability of the tree," and that this failure to act was negligent. (Doc. 122 at 8.) This theory implicates actions or nonactions even more distant from "tree felling" than the decision not to fell a tree.

As to Martin's claim based on "possessor of land adjacent to a public highway" doctrine, the court is unconvinced that the Construction Defendants — each of whom was hired to perform specific tasks on the land — are or were "possessor[s] of land" in the sense relevant to this theory of liability. The only North Carolina cases dealing with this doctrine are cases against defendants who had legal rights to the land, meaning owners or parties who had rented the land from an owner. See <u>Gibson</u>, 428 S.E.2d at 490–91; <u>Wallen v. Riverside Sports Ctr.</u>, 618 S.E.2d 858, 860 (N.C. Ct. App. 2005). It is true that the North Carolina Supreme Court has held in the attractive nuisance context that a party, although "not a possessor of the construction site," could still be held liable "subject to the same rules of liability which define the duty of the landowner" for harm resulting from its "creat[ion of] a condition upon the land on behalf of the possessor" when the party knows or should know that children are likely to trespass and be injured. <u>Broadway v. Blythe Indus., Inc.</u>, 326 S.E.2d 266, 269–70 (N.C. 1985). However, even assuming the North Carolina Supreme Court would extend this same "possessor of land" reasoning from the attractive nuisance context to the "possessor of land adjacent to a public highway" context, that reasoning would still not apply to the Construction Defendants. This is because the harm that befell Martin was not the result of a Construction Defendant's "creat[ion of] a condition upon the

land," Broadway, 326 S.E.2d at 270, but rather a result of their alleged failure to address a pre-existing condition on the land. Martin himself points out that the tree came into existence long before the Construction Defendants' arrival on the scene (Doc. 122 at 6), and (as noted in footnote 20, supra) there is no evidence in the record that the stream is manmade or — if so — that the Construction Defendants created it. This leads the court to the conclusion that the Construction Defendants could not be liable under any "possessor of land" theory in the first place.

Moreover, regardless of whether Martin's claims against any of the remaining Construction Defendants sound in inherently dangerous activity doctrine, "possessor of land adjacent to a public highway" doctrine, or ordinary negligence,[24] all such claims

---

[24] As to Carolina Seeding's motion for summary judgment, Martin's one-page response brief — containing only a short "Introduction" and "Conclusion" — does not make any argument as to inherently dangerous activity or "possessor of land adjacent to a public highway." (Doc. 115.) Instead, it only attacks Carolina Seeding's expert report and argues that there remains a genuine issue of material fact as to causation. (Id.) The court construes Martin's claim against Carolina Seeding as one for ordinary negligence. Martin's argument that Carolina Seeding's expert report is inadmissible rests on the theory that, because the expert (James R. Hopp) based his report on "the same photographs to be reviewed by a jury," the expert must not have employed any "specialized scientific knowledge or methodology." (Doc. 115 at 2.) As an initial matter — and as the court discusses more fully below — it is beyond the ken of the jury to divine what caused the tree to fall based on Martin's post-accident photographs. Thus, the very premise of Martin's objection to Mr. Hopp's report is mistaken; Martin's invitation to have the jury speculate as to the cause of the accident does not create a genuine dispute of material fact. Moreover, even if the photographs were competent jury evidence as to causation, that fact has no bearing on whether Mr. Hopp employed "specialized scientific knowledge" in reviewing the photographs and arriving at a conclusion.

necessarily fail because Martin has not forecast competent evidence on which a jury could find that the alleged dangerousness of the tree was known to the Construction Defendants. See Woodson, 407 S.E.2d at 238 (employer only liable in the inherently dangerous activity context "if it knew of the circumstances creating the danger"); Gibson, 428 S.E.2d at 492 (possessors of land only liable if they had "actual or constructive notice of the dangerous condition"); Fussell v. N.C. Farm Bureau Mut. Ins. Co., Inc., 695 S.E.2d 437, 440 (N.C. 2010) ("The duty [of ordinary care] does not require perfect prescience, but instead extends only to causes of injury that were reasonably foreseeable . . . ."). Martin's only evidence of the tree's condition at or before the time of the accident — as well as his only evidence of the Construction Defendants' knowledge of the tree's condition at or before the time of the accident — is a set of photographs taken after the accident and Martin's own affidavit based on a post-accident viewing of the scene. (Docs. 122-2, 122-4.) The photographs show

---

Mr. Hopp is a registered arborist with many decades of experience, not only in the general field of tree appraisal but also with similar equipment to that used by Carolina Seeding. (Docs. 102-2, 102-3.) That Mr. Hopp would be able to provide an expert opinion about the capacity of that equipment to harm tree roots of the size visible in the photographs is likely, regardless of what conclusions a layperson would be able to draw based on the same photographs. See Md. Cas. Co. v. Therm-O-Disc, Inc., 137 F.3d 780, 783 (4th Cir. 1998) (per curiam) ("All Daubert demands is that the trial judge make a 'preliminary assessment' of whether the proffered testimony is both reliable (i.e. based on 'scientific knowledge') and helpful (i.e. of assistance to the trier of fact in understanding or determining a fact in issue).").

the tree at issue fallen across the stream from what was apparently its prior position on or near the far bank of the stream. (Doc. 122-2.) In his affidavit, Martin states that he visited the site "[a] few days after" the accident and observed the fallen tree. (Doc. 121-4 at 1.) Martin observed that "[t]he base of the tree was immediately adjacent to the running water at the bottom of the gully," and he speculated that the "water was running under where the roots would have been if the tree was standing upright, effectively undercutting the soil that should have been supporting the tree." (Id. at 2.)

None of this evidence shows that the tree actually constituted a dangerous condition prior to the accident, much less that the Construction Defendants had actual or constructive notice that it was dangerous. Evidence that the base of the fallen tree appears to have been situated on the bank of a stream does not equate to evidence that such a position put the tree in danger of falling onto the roadway, and Martin has produced no evidence as to what might make the tree's (or any tree's) position dangerous. Further, Martin's speculation about where the roots "would have been" before the accident is just that: speculation. The court is certainly unable to tell from the post-accident photographs whether the tree's roots — ripped out of the ground as the tree fell — might have been undermined in their prior position before the accident, or whether the extent of any prior "undercutting" of the roots

rose to the level of creating a real danger.  Martin did not witness the tree prior to the accident, and he has introduced no evidence from any other witness prior to the accident.  He has not deposed anyone, nor has he introduced any other evidence of what the Construction Defendants knew or did not know about the tree. He also does not profess any special knowledge or training that would support his speculation about the dangerousness of the tree's position prior to the accident.  As a result, Martin has not put forward sufficient evidence under any of his theories on which a jury could find that his injury was foreseeable to any of the Construction Defendants.  Cf. Gibson, 428 S.E.2d at 492 (finding, as a matter of law, that the fact that a tree had been leaning towards the road prior to falling on the road did not constitute "evidence [that] would have put a reasonable landowner on notice that a dangerous condition existed," especially when no one "who observed the tree prior to its fall thought it was necessary to report" the tree as a potential danger).

What's more, as the foregoing discussion implies, Martin's lack of non-speculative evidence as to the condition of the tree also dooms his claims as to the element of causation.  As previously noted, no one witnessed the tree fall, and the only evidence of what may have caused it to fall consists of wind speed records, post-accident photographs, and Martin's speculation that the wind, in conjunction with the nearby stream "undercutting" the

tree's roots, caused the tree to fall.  But as other courts have pointed out, the "average lay person is not capable of discerning when a leaning tree may create a dangerous situation requiring an emergency response and whether the likelihood of the tree falling is related to the condition of the tree . . . or other circumstances."  Katkish v. District of Columbia, 763 A.2d 703, 706 (D.C. 2000).  In North Carolina, as in most jurisdictions, "expert testimony is generally required when the standard of care and proximate cause are matters involving highly specialized knowledge beyond the ken of laymen."  Smithers v. Collins, 278 S.E.2d 286, 289 (N.C. Ct. App. 1981).  Despite a generous and once-extended period in which to produce expert testimony, Martin has produced none, leaving the lay jury to engage in pure speculation about what factor or combination of factors may have caused the tree to fall.  This is insufficient to survive summary judgment. See Ross v. Fed. Deposit Ins. Corp., 625 F.3d 808, 817 (4th Cir. 2010) ("To survive summary judgment, the non-movant must bring forth 'fact-specific and not merely speculative' evidence establishing the cause of her injury." (quoting Driggers v. Sofamor, S.N.C., 44 F. Supp. 2d 760, 765 (M.D.N.C. 1998))).

In conclusion, Martin has failed to forecast evidence making the application of inherently dangerous activity or "possessor of land adjacent to a public highway" doctrine applicable to any of the Construction Defendants, and he has further failed to forecast

evidence as to notice, foreseeability, or causation as to either of these theories or as to an ordinary negligence theory. As a result, the Construction Defendants' motions for summary judgment will be granted.

### D. Remaining Motions

In recent weeks, Defendants have filed a large number of motions relating to the upcoming trial. (Docs. 146, 149, 151, 152, 154, 157, 159, 161, 163, 165, 167, 169, 171, 173, 175, 176, 179, 181, 183, 185, 187, 188, 191, 193, 194, 197, 199, 201, 203, 205, 207, 259, 261.) As the court is entering summary judgment in favor of Defendants on all claims, these motions will be denied as moot.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Martin's motion to dismiss (Doc. 117) is DENIED and Defendants' motions for summary judgment (Docs. 102, 106, 108, 110, 112) are GRANTED.

IT IS FURTHER ORDERED that all other outstanding motions (Docs. 146, 149, 151, 152, 154, 157, 159, 161, 163, 165, 167, 169, 171, 173, 175, 176, 179, 181, 183, 185, 187, 188, 191, 193, 194, 197, 199, 201, 203, 205, 207, 259, 261) are DENIED AS MOOT and this action is DISMISSED WITH PREJUDICE.

/s/   Thomas D. Schroeder
United States District Judge

December 31, 2018